UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

v.  Case No. 6:19-cr-253-Orl-37LRH-1

JORGE SANCHEZ,

## ORDER

Defendant Jorge Sanchez (also known as Jose Sanchez) ("**Sanchez**") was indicted for possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(b)(1)(A). (Doc. 3.) He now moves to suppress statements and evidence from two separate incidents: the initial stop and search of his car on October 8, 2019; and inculpatory statements he made to Drug Enforcement Agency ("**DEA**") agents on October 23, 2019. (Doc. 25 ("**Motion**").) The Government opposes. (Doc. 29.) On review, the Court grants the Motion in part—suppressing evidence from the October 8 stop.

### I.     BACKGROUND[1]

A little after midnight on October 8, 2019 Sergeant Todd Beuer ("**Sgt. Beuer**") and Deputy Adam Steuerwald ("**Deputy Steuerwald**") from the Brevard County Sherriff's

---

[1] At the hearing on March 9, 2010, Sgt. Beuer and Special Agent Patrick Campbell testified under oath. (*See* Doc. 30.) There are no official transcripts available for this hearing, but the where the Court points to facts contained in the parties pleadings (Docs. 25, 29) or the Court minutes (Doc. 30), these facts were confirmed by testimony at the hearing.

-1-

Office were conducting a follow-up investigation into a case Deputy Steuerwald had worked in September. (Doc. 25-1, p. 4.) They were investigating a particular house on Skelly Drive in Rockledge, Florida. (*Id.*; *see also* Doc. 30.) Upon arriving, they each parked their marked patrol vehicles just south of the intersection of Skelly Drive and Florida Avenue. (Doc. 30.)


**Defense Exhibit H (Doc. 32-8, p. 3.)**

The officers got out of their cars and walked down Skelly Drive, noting the tag numbers of vehicles parked in front of the house they were investigating. (*Id.*; *see also* Doc. 25-1, p. 4.) They then returned to their vehicles to run the plate numbers. (Doc. 25-1, p. 4.) At that point they observed a man enter the house and leave again a short time later on foot. (*Id.*) So Deputy Steuerwald stopped the man to question him. (*Id.*) While the stop

was occurring, the officers observed a car leave the residence. (*Id.*) This vehicle was being driven by Sanchez. (Doc. 30.)

Deputy Steuerwald asked Sgt. Beuer to "develop his own probable cause and conduct a traffic stop on the car." (Doc. 25-1, p. 4.) Sgt. Beuer did so—or at least he thought he did (more on this later)—and pulled Sanchez over for violating the Florida "stop bar" statute. (*Id.* at p. 15); *see also* Fla. Stat. § 316.123. While Sgt. Beuer was conducting the traffic stop, Deputy Steuerwald arrived on-scene (having released the stopped individual after he did not consent to a search) and walked his drug dog, Merle, around the car. (*Id.*; *see also* Doc. 30.) Merle alerted at the passenger side door, the officers searched the car, found methamphetamine and cash, and arrested Sanchez—and Sgt. Beuer issued Sanchez a written warning for not stopping at the stop bar. (Doc. 25-1, p. 15.) First Sanchez was charged in state court for drug offenses, but later he was charged federally. (Docs. 1, 3, 30; *see also* Doc. 25-1, pp. 21, 25.) About two weeks after Sanchez was arraigned in state court, and after the DEA had taken over the case, two DEA agents interviewed Sanchez in jail. (Doc. 25, ¶¶ 14, 21; Doc. 31-2.) Sanchez made inculpatory statements. (Doc. 31-2.)

Sanchez now moves to suppress the evidence and statements made during the October 8, 2019 traffic stop and statements to DEA agents on October 23, 2019. (Doc. 25.) The Government responded (Doc. 29) and the Court held two hearings on the matter (Docs. 30, 35). The matter is ripe.

## II. ANALYSIS

### A. The October 8 Traffic Stop

Florida has a "stop bar" statute. Fla. Stat. § 316.123. For our purposes the statute requires:

> [E]very driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection.

*Id.* Sgt. Beuer conducted a traffic stop of Sanchez on October 8, 2019 because Sanchez failed to stop at the stop bar at the intersection of Skelly Drive and Florida Avenue. (*See* Doc. 25-1, p. 15.) During the stop, Merle, a drug sniffing dog brought to the scene by Deputy Steuerwald, alerted to narcotics, the vehicle was searched, and drugs were found. (*Id.* at pp. 4–5, 15.) Sanchez was arrested. (*Id.*)

Sanchez moves to suppress the fruits of this search because there was no probable cause to believe he committed a traffic violation and no reasonable articulable suspicion he was engaged in criminal activity. (Doc. 25, pp. 7–8; *see also* Doc. 30.) Sgt. Beuer makes no bones about the fact that the stop was a pretext to investigate for drug activity. The Government and the officers acknowledge he was sent "to develop his own probable cause to conduct a traffic stop on the car which he did." (Doc. 25-1, p. 4.) Sgt. Beuer used Sanchez's violation of the "stop bar" statute as his predicating probable cause. (*Id.* at p. 15.) Unfortunately for Sgt. Beuer, there was no stop bar at the intersection, a fact both he and the Government now concede. (Doc. 29, pp. 5–6.)

At the hearing, Sgt. Beuer identified this intersection and confirmed that Sanchez brought his vehicle to a complete stop at a position in relation to the stop sign as depicted in this photo. (*See* Doc. 30; Doc. 32-8, p. 8.)


**Defense Exhibit I (Doc. 32-8, p. 8.)**

Undaunted by the absence of a factual basis for Sgt. Beuer's traffic violation predication, the Government argues this "mistake" was objectively reasonable and so doesn't undermine the probable cause determination. (Doc. 29, pp. 5–10.) To bolster this argument, Special Agent Patrick Campbell ("**Agent Campbell**") did some aerial field work and identified several intersections in the area that were configured with clearly marked stop bars. (*See* Doc. 31-3.) Besides showing marked stop bars, this video footage also provided an unintended but useful contrast between the marked intersections and the one in question. (*See id.*)

This intersection is best described by the pictures in the record. (*See* Docs. 31, 32 and attached exhibits.) Skelly Drive intersects Florida Avenue at a point where two large roughly paved parking areas are on either side of Skelly. (*See* Doc. 30; Doc. 31-5, p. 2.)


**Government Exhibit 5 Photo 0032 (Doc. 31-5, p. 2.)**

The pavement around the stop sign is rough and pockmarked and the stop sign is in a dirt and gravel circle located some distance back from the point where Skelly Drive intersects Florida Avenue. Would a reasonably objective police officer, armed with the information known to Sgt. Beuer, have believed Sanchez had driven through a "clearly marked stop line" on the pavement at this intersection? *See* Fla. Stat. § 316.123. If so, Sgt. Beuer's mistake doesn't matter and the later stop was not a Fourth Amendment violation. *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth

Amendment"); *see also Heien v. North Carolina*, 574 U.S. 54, 60 (2014). But if it was not objectively reasonable to believe this intersection contained a clearly marked stop bar, then there was no probable cause for the stop and the fruits of the search must be suppressed. *See Chanthasouxat*, 342 F.3d at 1280 (explaining "[a]s a general rule, the evidence gathered as a result of an unconstitutional stop must be suppressed") (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

While true that Sgt. Beuer's subjective intent in conducting the traffic stop is not relevant, to assess whether it was objectively reasonable for him to use a "stop bar" violation for probable cause, the putative "objective officer" must be armed with the same circumstances and information possessed by Sgt. Beuer on this night. *See Whren v. United States*, 517 U.S. 806, 810, 813 (1996); *Chanthasouxat*, 342 F.3d at 1276. The configuration of the intersection, the location of the stop sign, the condition of the road surface, and the visual obstructions as they appeared at the time in question are well depicted in the Government's photographs. (*See* Doc. 31-5; *see also* Doc. 30.)

While generally familiar with stop bars, and believing them to be fairly ubiquitous, Sgt. Beuer acknowledged he was not overly familiar with this area of Rockledge, Florida. (Doc. 30.) But Sgt. Beuer had walked back and forth on Skelly Drive at or near the intersection with Florida Avenue, so he had an opportunity to view the road surface condition and the general "lay of the land," both in his vehicle and on foot. (*Id.*)

Looking at the photographic evidence, which Sgt. Beuer accepts as properly depicting the scene (Doc. 31-5; Doc. 32-8, p. 8), it is difficult to imagine how a motorist

might, at this particularly odd intersection, have any ability to see oncoming traffic from the left if stopped anywhere short of the point where Sgt. Beuer concedes Sanchez stopped his vehicle on this night. An added stop bar would have made the situation worse from a safety perspective. The stop sign itself is stuck in an odd circular dirt space in what appears to be an extension of the adjacent parking lot. (Doc. 32-8, p. 8.) There is certainly no crosswalk, curbing or sidewalk that might suggest the need for, or presence of, a "stop bar." (*Id.*) The condition of the pavement appears rough and broken, it creates no visual impression of road markings—"clearly marked" or otherwise. (*Id.*) So even though there are other intersections in the general area marked with a "stop bar," they do not show the unique characteristics of this one. In short, it was not objectively reasonable for Sgt. Beuer to believe that Sanchez violated Florida Statute § 316.123 by failing to stop at a stop bar that not only was not there, but where there was nothing about this intersection to suggest it *would* be there—quite the contrary. When you add the fact that Sgt. Beuer actually traversed the area on foot, the reasonableness of his predication is further undermined. (*See* Doc. 30.)

If these facts qualify as "objectively reasonable", then the Fourth Amendment's protection against unreasonable search and seizure is simply not applicable to a pretextual traffic stop. The Court should stop imbuing the "objectively reasonable" officer with a cloak of constitutional comfort for justifications that strain credulity and discount the facts out of deference to their necessary "game time decisions". *See Chanthasouxat*, 342 F.3d at 1276. While deference is a necessary component of the analysis,

it does not warrant a rubber stamp. The Fourth Amendment still has some teeth in a traffic stop. The Court will suppress any evidence gathered as part of that stop—any physical evidence and any statements made by Sanchez during the stop. *See Wong Sun*, 371 U.S. at 484–85; *Chanthasouxat*, 342 F.3d at 1280.

**B.     October 23, 2019 Statements**

Sanchez also argues statements made to two DEA agents should be suppressed. (Doc. 25, pp. 8–9.) After his arrest on October 8, 2019, Sanchez was initially charged in state court. (Doc. 25, ¶¶ 14–15.) He was appointed a Florida public defender that same day. (*Id.*; *see also* Doc. 25-1 pp. 19, 23; *State of Florida v. Sanchez*, No. 05-2019-CF-49010.) But later the Federal Government took over the case: Sanchez's state charges were dropped and a federal complaint was filed on October 11, 2019. (*See* Doc. 30; *see also* Doc. 1.) Fifteen days after Sanchez was appointed a public defender in state court—on October 23, 2019—two DEA agents, Agent Campbell and Agent Brian Lammers, interviewed Sanchez at the jail. (Doc. 25, ¶¶ 14, 21; Doc. 25-1; Docs. Doc. 31-2; 32-5; *see also* Doc. 30; *State of Florida v. Sanchez*, No. 05-2019-CF-49010.) The interview was audio recorded, and Sanchez made incriminating statements. (Doc. 31-2.) Sanchez was indicted federally on December 4, 2019. (Doc. 3.)

The DEA agents did not immediately *Mirandize* Sanchez—instead, they first asked Sanchez about his real name and immigration status,[2] and encouraged Sanchez to talk to

---

[2] "Jorge Sanchez" is actually the name of Sanchez's brother, who is an American citizen. (*See* Doc. 31-2.) Sanchez's real name appears to be Jose Martin Sanchez. (*Id.*)

them, before reading him his rights. (Doc. 31-2); *see also Miranda v. Arizona*, 384 U.S. 436 (1966). To the extent Sanchez moves to suppress these initial statements as violating *Miranda*, the agents' questions fall under the "routine booking questions" exception. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601–602 (1990) (explaining an exception to *Miranda* exists for questions about "the biographical data necessary to complete booking or pretrial services") (citation and quotation marks omitted). *Miranda* is not implicated if the questions are "reasonably related to the police's administrative concerns." *Id.*; *see also United States v. Brotemarkle*, 449 F. App'x 893, 896 (11th Cir. 2011). A defendant's true name is related to administrative concerns—and the agents did not question Sanchez about the traffic stop or related drug offenses before *Mirandizing* him. (*See* Doc. 31-2.) So there was no violation of Sanchez's constitutional rights predicated on *Miranda*.

The discussion isn't over, however. Sanchez also moves to suppress all of his statements to the agents—including statements he made after waiving his *Miranda* rights—because of alleged violations of his Fourth, Fifth, and Sixth Amendment Rights. (Doc. 25; *see also* Doc. 30.) Sanchez first argues the DEA agents violated his Fifth Amendment rights by re-interrogating him after he had invoked his right to silence at the traffic stop. (*See* Doc. 25; *see also* Doc. 30.) But that was fifteen days prior—a defendant's right to silence, once invoked, does not extend forever. *See Michigan v. Mosley*, 423 U.S. 96, 104–07 (1975). When deciding if a Defendant's Fifth Amendment right has been violated by a subsequent interrogation, courts look to four factors: if the interrogation ended immediately upon the initial invocation; if substantial time elapsed between

interrogations; if the defendant was re-*Mirandized*; and if the second interrogation involved a different officer asking about a different crime. *Id.* The key inquiry is whether a defendant's invocation of the right to silence was "scrupulously honored." *Id.* at 104. The absence of a single *Mosley* factor is not dispositive—courts are to look "to the circumstances as a whole." *United States v. Gray*, 771 F. App'x 976, 979 (11th Cir. 2019) (cert. denied) (citing *Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1296–97 (11th Cir. 2007)). Here, Sanchez's request to remain silent was honored immediately when he made it; he was not questioned for over two weeks; and he was re-*Mirandized.* (Docs. 31-1, 31-2; *see also* Doc. 25, ¶¶ 14, 25.) He was also interviewed by different people, and in anticipation of being indicted federally as opposed to at the state level—although admittedly for the same crime. (Doc. 31-2.) Looking at the circumstances as a whole, Sanchez's Fifth Amendment rights were not violated. *See United States v. Bosby*, 675 F.2d 1174, 1182 (11th Cir. 1982) (finding no violation when defendant was re-interviewed over two weeks later); *see also Gore*, 492 F.3d at 1297-99 (finding no constitutional violation when a defendant invoked his right to silence and was re-*Mirandized* and re-interrogated (about the same crime) seven days later); *Jackson v. Dugger*, 837 F.2d 1469, 1471 (11th Cir. 1988) (finding no violation where there was a six-hour break between interrogations).

Next, Sanchez argues this interview took place in violation of his Sixth Amendment rights. (Doc. 25, pp. 8–9.) The Sixth Amendment right to counsel attaches once "a prosecution is commenced . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S.

191, 198 (2008) (citations and quotation marks omitted). But the Sixth Amendment is offense-specific (as defined by the *Blockburger* test) and "the dual sovereignty doctrine applies in the Sixth Amendment context." *United States v. Burgest,* 519 F.3d 1307, 1308, 1310 (11th Cir. 2008); *see also Blockburger v. United States*, 284 U.S. 299 (1932). "[S]tate and federal offenses are not the same for purposes of the Sixth Amendment right to counsel." *Burgest*, 519 F.3d at 1308. While Sanchez had a right to counsel in his state case, he would not be indicted federally until December 4, 2019 (Doc. 3) and so the Sixth Amendment is not implicated for his federal charges. *See United States v. Langley*, 848 F.2d 152, 153 (11th Cir. 1988) (explaining "[t]he mere filing of a complaint and the issuance of a warrant for the defendant's arrest" is not enough for the Sixth Amendment to attach).

Finally, Sanchez argues this interview should be suppressed as fruit of the poisonous tree, as the evidence from the traffic stop was suppressed for Fourth Amendment violations. (Docs. 30, 35.) "Under the Fourth Amendment, evidence derived from information that was obtained by unconstitutional means can be suppressed as 'fruit of the poisonous tree.'" *United States v. Powner*, 481 F. App'x 529, 530 (11th Cir. 2012) (citing *Wong Sun*, 371 U.S. at 488). But not all evidence need be suppressed "simply because it would not have come to light but for the illegal actions of the police." *United States v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007) (quoting *Wong Sun*, 371 U.S. at 488). Instead, courts should ask if "intervening events or circumstances independent of the primary illegality may have so attenuated the causal connection as to dissipate the taint of the unlawful police action" *United States v. Timmann*, 741 F.3d 1170, 1182 (11th Cir.

2013) (quotation marks and citation omitted). Factors courts consider include: "whether the testimony was coerced or induced"; "whether the tainted evidence itself was used to obtain that testimony"; "the amount of time that elapsed since the illegal search and the testimony"; and "whether the testimony can be logically traced back to the tainted evidence". *Powner*, 481 F. App'x 550 (citing *United States v. Ceccolini*, 435 U.S. 268, 279–80 (1978)). "When considering whether witness testimony is admissible, the district court must consider the degree of free will exercised by the witness." *United States v. Bergin*, 455 F. App'x 908, 910 (11th Cir. 2012) (quoting *United States v. Brookins*, 614 F.2d 1037, 1042 (5th Cir. 1980) (quotation marks omitted)).

Here, the statements at the subsequent interview by DEA agents were sufficiently attenuated to dispel the taint of the illegal search. The interview occurred two weeks later, the testimony wasn't coerced or induced in any way, and the tainted evidence seized in the illegal stop was not used to obtain his statements, rather, the federal indictment was. (Doc. 25, ¶¶ 14, 21; Doc. 31–2). True, Sanchez likely would not have been in custody and facing charges absent the illegal stop—but Sanchez waived his *Miranda* rights and spoke to the DEA agents and but-for causation is not the standard courts use in a fruits analysis. *See Delancy*, 502 F.3d at 1309. The statements made by Sanchez, two weeks after the illegal search, were an act of his own free will—and an act sufficiently attenuated to dissipate the taint of the illegal search. *See Bergin*, 455 F. App'x at 911. So the statements made by Sanchez on October 23, 2019 will not be suppressed.

### III. CONCLUSION

It is **ORDERED AND ADJUDGED** Defendant Jorge Sanchez's Motion to Suppress Statements and Evidence (Doc. 25) is **GRANTED IN PART AND DENIED IN PART:**

1. Evidence and statements obtained on October 8, 2019 as part of the traffic stop by Sgt. Beuer and Deputy Steuerwald are **SUPPRESSED.**

2. In all other respects, the Motion is **DENIED.**

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 20, 2020.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record